IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| KRISTEN FITZHUGH, on behalf of herself and others similarly situated, | ) ) ) | Case No. 1:11-cv-00533 |
| | ) | Judge Christopher A. Boyko |
| Plaintiffs, | ) ) | |
| vs. | ) ) ) | **SUPPLEMENTAL DECLARATION OF DEBRA GAMBLE IN SUPPORT OF DEFENDANTS AMERICAN INCOME** |
| AMERICAN INCOME LIFE INSURANCE COMPANY and TORCHMARK CORPORATION, | ) ) ) ) | **LIFE INSURANCE COMPANY AND TORCHMARK CORPORATION'S MOTION TO COMPEL ARBITRATION AND DISMISS ENTIRE ACTION OR, IN** |
| Defendants. | ) ) ) | **THE ALTERNATIVE, DISMISS ALL CLASS CLAIMS AND STAY REMAINING PROCEEDINGS** |

I, Debra Gamble, declare as follows:

1.     I am Senior Vice President of Agency for Defendant American Income Life Insurance Company ("AIL"). I have worked for AIL for over thirty years. As part of my job responsibilities, I am personally familiar with AIL's records relating to independent sales agents. I have personal knowledge of the matters set forth herein or have acquired knowledge by review and analysis of the business records kept by AIL in the normal course of business regarding its independent sales agents. If called as witness, I could and would competently testify to the facts set forth in this declaration, under oath.

2.     Attached hereto as Exhibit A is a true and correct copy of a Union Dues Check-Off Authorization contained in AIL's agent file for Kristen Fitzhugh.

3.     Attached hereto as Exhibit B is a true and correct copy of a resume contained in AIL's agent file for Kristen Fitzhugh.

4.     Attached as Exhibit C is a true and correct copy of the Union Agreement between State General Agents of American Income Life Insurance Company and American Income Life

Insurance Company and Office & Professional International Union Local 277, AFL-CIO, dated

July 2009. I was a signatory tot his agreement "For the Company," as reflected in this copy.

     5.     In accordance with AIL practice, agent contracts are sent to AIL's home office in

Waco, Texas where they are scanned into an electronic document retention system. Afterwards,

original contracts that the home office receives are destroyed.

     6.     Ms. Fitzhugh's Supervising Agent Contract, attached to my May 16, 2011

declaration as Exhibit A, has a stamp on each page reading "Agency" with the date "March 25,

2010." That "Agency" date stamp is applied at AIL's home office. The stamp on

Ms. Fitzhugh's Supervising Agent Contract indicates that it was received in Waco, Texas, on or

very shortly before, March 25, 2010.

     7.     AIL's form "Agent" Contracts and "Supervising Agent" Contracts are generated

in Texas. In 2010, AIL had only one form of "Supervising Agent" Contract. That is the form

attached to my May 16, 2010 declaration as Exhibit A bearing Ms. Fitzhugh's signature.

     8.     AIL agent files are stored in AIL's home offices in Texas. In accordance with

AIL policy, customer applications are sent to Texas. Policy underwriting is done is Texas, and

polices are issued in Texas. Agent commission payments are determined in Texas, and tax forms

reflecting payments to agents are issued from Texas.

     I declare under penalty of perjury, under 28 U.S.C. § 1746, that the foregoing is true and

correct.

     Signed on July 5, 2011, at Waco, Texas.

 

                                 _Debra Gamble_
                                          Debra Gamble

# EXHIBIT A

## American Income Life Insurance Company
P.O. Box 2608 Waco, TX  76797

| Name: Last | First | Middle |
|---|---|---|
| Fitzhugh | Kristen | Mae |

### UNION DUES CHECK-OFF AUTHORIZATION

I authorize American Income Life Ins. Company to deduct the initiation fee and the monthly dues of Office and Professional Employees International Union Local 277 and send it to such local.

This authorization shall be irrevocable for the term of applicable contract between the Union and the Company, or for one year, whichever is the lesser, and shall automatically renew for successive periods unless I gave written notice to the Company and the Union at least 60 days and not more than 75 days before any renewal date.

**UNION DUES ARE NOT DEDUCTIBLE AS CHARITABLE CONTRIBUTIONS FOR FEDERAL INCOME TAX PURPOSES.**

| Signature X | Date (mm/dd/yy) |
|---|---|
| Kristen Fitzhugh | 10/8/09 |

### VOTE DEDUCTION AUTHORIZATION

I hereby authorize American Income Life Ins. Company to deduct the following weekly and send it to the Office of Professional Employees International Union, Local 277.

(Check one)  ____ $.50  ____$1.00  ____$2.00 $ O (other)

This amount will be forwarded for deposit with the J.B. Moss Voice of the Electorate (Vote) Fund. I understand that the J.B. Moss Voice of the Electorate (Vote) Committee will make political contributions and expenditures in connection with federal, state, and local elections, and that this voluntary authorization is in response to the joint fund-raising effort by OPEIU and the AFL-CIO.

This authorization may be revoked by me at any time by written notice to AIL and/or Office and Professional Employees International Union, Local 277, as applicable.

**"POLITICAL ACTION COMMITTEE" CONTRIBUTIONS ARE NOT TAX DEDUCTIBLE.**

| Printed Name | Kristen Fitzhugh | Date:(Month/Day/Year) 10 / 8 / 09 |
|---|---|---|
| Signature | Kristen Fitzhugh | |

AGENCY

OCT 13 '09

# EXHIBIT B

# KRISTEN M. FITZHUGH

1914 Pembrooke Lane • Avon • Ohio • 44011 • 216.509.7022• krisfit@aol.com

**WORK EXPERIENCE**

Private Family, Miami, FL, Southampton, NY, New York, NY
**Nanny,** September 2007-January 2009
- Responsible for all personal care of twin boys.
- Assisted with educational and social development of charges.

First Magnus, Cleveland, Ohio
**Account Executive,** July 2007-August 2007
- Call on new accounts to tell them about First Magnus and our products, as well as educate them on our online pricing product.
- Visit current accounts to provide ongoing support for pricing and placing loans.
- Do presentations for mortgage broker shops on my company, our products, and how to use our online system.

Citadel Financial Group, North Royalton, Ohio
**Sales Manager,** September 2005- July 2007
- Train loan officers who have no experience to understand the business, the software and selling of loans.
- Teach experienced loan officers about our systems and our lenders and help them become even better salespeople.
- Develop new, highly coveted systems for organization, customer satisfaction and loan placement.
- Create new marketing materials to bring in business for myself and the company.
- In-depth training on sub-prime and creative financing.
- Work with customers from preliminary interview through loan closing, then continuing the relationship for referrals and future refinances.
- Continuous training and education on loan programs, lenders, systems, marketing and lead development.

Fifth Third Bank, Cleveland, Ohio
**Senior Mortgage Loan Representative,** December 2004- September 2005
- Find customers in Ohio who are interested in refinancing their home or purchasing a new home and help them achieve their goals.
- Meet with realtors, bankers, builders, financial advisors and others in the mortgage/real estate industry to develop relationships for future referrals.
- Create marketing materials to find new customers and create name recognition in the field for myself and my company.
- Originate and process mortgage loans from initial interview with customer through closing.
- Attend various networking functions to get Fifth Third's name around to the general public and for future relationships.

Restaurant.com, Cleveland, Ohio
**Regional Sales Manager,** July 2002- December 2004
- Cold call on restaurants to present Restaurant.com marketing programs in a territory covering all of northern Ohio.
- Close sales based on qualified leads from Sysco Foods.
- Work at various trade shows to promote our programs to restaurants.
- Manage three District Sales Managers and provide them with ongoing sales training and support.
- Take photographs of restaurants and create virtual tours.
- Develop marketing materials to distribute to restaurants.

AGENCY

OCT 13 '09

**KMF RESOURCES, Rocky River, Ohio**
**Owner,** April 2001- April 2003
- Provide staffing solutions for companies in the Information Technology, Biotechnology, Health Care and Environmental Science industries.
- Recruit candidates for open positions via Internet searching, resume databases, job postings, referrals and networking.
- Provide outsourcing services to small companies who need help with their human resources, administrative, marketing and/or sales departments.
- Contact potential clients via cold calls, networking, conferences, advertising, promotions, marketing campaigns, leads and referrals.
- Develop relationships with companies and their HR Directors.
- Work with people who are looking to make a career change and help them find a new position.
- Provide human resource services for companies such as background checks, reference checks and interviews.
- Take care of administrative tasks for companies such as database design and maintenance, transcription, typing and Internet research.
- Perform marketing and sales services for companies such as writing and editing marketing information, lead generation, cold calls and contact management.

**MAXIM GROUP, Seven Hills, Ohio**
**IT Recruiter,** April 2000- April 2001
- Recruit IT personnel for various contracting jobs based on client needs via Internet recruiting, database searching, referrals, etc.
- Sell Maxim Group, as an employer, to potential consultants.
- Sell consultants to clients who are looking for particular positions to be filled, as well as proactively.
- Cold call potential clients and consultants to sell Maxim Group and our services.
- Build and maintain strong relationships with prospective and current contractors.

| | |
|---|---|
| **EDUCATION** | **OHIO UNIVERSITY, Athens, Ohio**<br>Major: Bachelor of Science in Journalism<br>Specialization: English    Concentration: Interpersonal Communication<br>Major G.P.A.  3.7/4.0    Cumulative G.P.A. 3.4/4.0<br>Graduation Date:  March 2000 |
| **COMPUTER EXPERIENCE** | Microsoft Word, ACT, Microsoft Excel, PowerPoint, Photoshop, Calyx Point,<br>Microsoft Outlook, Freehand, QuarkXPress, Microsoft Access |

**References Available Upon Request**

AGENCY

OCT 1 3 '09

# EXHIBIT C



**UNION AGREEMENT**

*between*

**STATE GENERAL AGENTS OF
AMERICAN INCOME LIFE
INSURANCE COMPANY**

*and*

**AMERICAN INCOME LIFE
INSURANCE COMPANY**

*and*

**OFFICE & PROFESSIONAL
EMPLOYEES
INTERNATIONAL UNION
LOCAL 277, AFL-CIO**

**July 2009**

Agents & Public Relations Union Contract



## PREAMBLE

AGREEMENT entered into between the OFFICE & PROFESSIONAL EMPLOYEES INTERNATIONAL UNION, LOCAL 277, AFL-CIO, hereinafter the "UNION", AMERICAN INCOME LIFE INSURANCE COMPANY hereinafter the "COMPANY" and the State General Agents.

With both the letter and spirit of this Agreement as a basis, we seek to establish an equitable and harmonious relationship that will enable the Company and its independent agencies ("Agencies") to prosper and operate efficiently under competitive conditions, while providing agents and public relations representatives (hereinafter "PR Rep") with good compensation and decent working conditions.

The spirit of this Agreement is one whereby the Company and its State General Agents (hereinafter "SGA") will deal with Agents and PR Reps honestly, fairly, and with humanity consistent with sound business principles.

Unless the context otherwise requires, the following definitions apply in this Agreement: "Agent" means career agents and non-career agents, as defined in Section 4 of Article 18. "Individuals" or "persons" means Agents or PR Reps, as applicable.

## LIMITED LIABILITY

The Union, in making this Agreement, is acting as agent for the individuals covered and shall not be liable for strikes, breaches or defaults. In the event of a strike, slowdown or work stoppage in violation of this Agreement:

(a) The Union shall declare publicly that such action is unauthorized.

(b) The Union shall promptly order its members to return to work

1

(c) Failure to return to work when ordered is just reason for discharge.

The Company, in making this Agreement, is acting on its own behalf, and as agent for its SGAs.

Nothing contained herein shall be construed to create the relationship of employer and employee between the Company and the agent or PR Rep or between the SGA and the agent or PR Rep. The agent or PR Rep may exercise their own judgment as to the time and manner of performing services. Rules and regulations may be prescribed respecting the conduct of the business and the results required, while not interfering with such freedom of action.

The agent or PR Rep in the performance of activities shall be acting on the agent's or PR Rep's own behalf and not as an employee, partner, joint-venturer or associate. The agent or PR Rep shall refrain from holding themselves out as an employee.

## ARTICLE 1
### RECOGNITION

SECTION 1. The Union is recognized as the sole collective bargaining agent for agents and PR Reps, exclusive of supervisory persons with authority to contract, transfer, suspend, layoff, recall, promote, discharge or discipline Agents and PR Reps, or to effectively recommend such action, if the exercise of such authority is not of merely routine nature but requires the use of independent judgment. A person having a PR Manager, Supervising Agent, General Agent, Master General Agent, Regional General Agent or State General Agent contract with the company that have such authority is not a member of the bargaining unit.

SECTION 2. This Agreement is binding upon State General Agents.

2

## ARTICLE 2
### RELATIONS & PRINCIPLES

SECTION 1. There will be no interference with, coercion or restraint regarding the exercise of rights to bargain collectively, through representatives, or engaging in concerted activities for the purpose of collective bargaining or other mutual aid and protection, except as such concerted activities may be prohibited by law or by this Agreement.

SECTION 2. The Agencies shall abide by Union principles in the purchase and use of goods such as printing and publications.

SECTION 3. The Union will affiliate appropriate members with Local Central Labor Councils and State AFL-CIO Bodies. The Union will be furnished a list of the members to be affiliated and the necessary forms. A sufficient number of members must exist in an area to warrant a requested affiliation. Any agency that does not furnish the Union with a copy of its PR Rep's agreement and lists of members to be affiliated may have affiliation dropped at the discretion of the Union. The Union shall determine delegates to affiliated organizations.

SECTION 4. Correspondence transmitted from Agency offices shall carry the Office & Professional Employees International Union's Union Label, excepting work of nonunion personnel, in which case the Union Label shall not be used. The Agencies shall post the union office card furnished by the Union in prominent places.

SECTION 5. Agents and PR Reps will not be required under penalty of discharge or discipline to cross any picket line maintained by any labor organization and any refusal to cross a picket line singly or in concert shall not constitute a breach of this Agreement.

3

## ARTICLE 3
## UNION SECURITY

SECTION 1. New Agents and PR Reps shall be informed of representation by the Union, introduced to the Steward, and furnished with dues and V.O.T.E. check-off.

SECTION 2. The Union shall be furnished with the names, classifications and home addresses of new Agents and PR Reps within 30 days. The Union shall be furnished a list of Agents and PR Reps and an alphabetical listing of dues and V.O.T.E. check-off upon request.

SECTION 3. Where permitted by law, Agents and PR Reps shall as a condition of continued contract 31 days from the date of starting work either become and remain members of the Union in good standing or undertake compliance with Section 4 of this Article. Where law prohibits a Union Shop, the maximum union security legal shall apply.

SECTION 4. Membership in the Union is not compulsory. Individuals have the right to join or not. Membership in the Union is separate, apart and distinct from the assumption of one's equal obligations to the extent that one receives equal benefits. The Union is required to represent all individuals in the bargaining unit. The individual is obligated to pay the individual's own way and assume a fair share of the obligation along with the grant of equal benefit. Therefore, where permitted by law, each individual who does not acquire and maintain membership in the Union shall as a condition of continued contract pay the Union each month a service charge or bargaining agency fee toward the administration of this Agreement and the representation of such individuals. The charge for the first month shall be in an amount equal to the Union's regular initiation fee and monthly dues, and for each month thereafter in an amount equal to the regular monthly dues.

4

SECTION 5. The foregoing sections of this article shall be applicable only in accordance and consistent with applicable provisions of federal and state law. Any section of this article that conflicts with any federal or state law will not be enforced.

SECTION 6. If any provision of this Agreement is held invalid, the remainder shall not be affected.

## ARTICLE 4
## CHECK-OFF OF INITIATION FEES, DUES AND VOLUNTARY VOICE OF THE ELECTORATE CONTRIBUTIONS

SECTION 1. The Company will deduct initiation fees, dues, and V.O.T.E. contributions for persons who authorize

SECTION 2. Authorization of check-off of dues shall be irrevocable for the term of this Agreement, or for one year, whichever is the lesser. Authorization shall automatically renew for successive yearly periods until revoked by written notice to the Union at least 60 days and not more than 75 days before any periodic renewal date.

## ARTICLE 5
## VISITATION OF UNION REPRESENTATIVES

Representatives of the Union shall have the right to enter work premises to investigate working conditions or disputes. They shall have the right to meet with stewards or with Agents and PR Reps involved in a dispute. Union representatives shall report to the manager of the agency upon entering such premises.

5

## ARTICLE 6
### SENIORITY AND DISCIPLINE ACTION

SECTION 1. No Agent and PR Rep shall be disciplined or discharged, except for just and sufficient cause, after full consideration of the person's rights and dignity. Upon the request of such person, the Union shall be given in writing the reason for any such action. Termination without cause may be given with 30 days written notice. Before an agent or PR Rep is terminated for lack of production or returned to a lower compensation contract, they shall receive a written notice and be given a 90 day period to improve. Any notice and/or warning shall be null and void after 12 months from date of issue. A copy of the notice shall be furnished to the union upon request.

SECTION 2. Each person contracted shall be on a 3-month probationary period and such probationary period may be extended an additional 3 months by agreement. Persons on probationary status do not have recourse to grievance procedure for discharge except when discharge is in violation of Article 10.

SECTION 3. Agents and PR Reps transferred from one State General Agent to a different State General Agent maintain rights and benefits, and service is not broken. Requests for transfers shall be in writing and give 60 days notice, and shall not be unreasonably denied. Transfer request to another agency located within a 250 mile radius will be reviewed but no transfer can occur for a minimum of 120 days from request date and consideration will include the total number of people requesting transfer to the new agency.

## ARTICLE 7
### UNION BULLETIN BOARDS

Each Agency shall supply on its premises sufficient bulletin boards to be used for Union business only. The Union shall delegate one of its representatives to post notices. Before such notices are posted, a copy shall be submitted to the Manager of the Agency.

## ARTICLE 8
### PRINTING OF AGREEMENT

The Company shall bear the cost of printing of this Agreement. Members shall be given a copy.

## ARTICLE 9
### SEPARABILITY OF PROVISIONS

If any law now existing or hereafter enacted, or any proclamation, regulation, or edict of any state or national agency shall invalidate any portion of this Agreement, the remainder shall remain in effect and either party hereto upon notice to the other may reopen for renegotiations of the invalidated portion.

## ARTICLE 10
### NON-DISCRIMINATION

SECTION 1. This Agreement shall apply alike to individuals without regard to race, creed, color, sex, national origin, **sexual orientation** or age.

SECTION 2. There shall be no discrimination in promotion, demotion, layoff, or recall between individuals because of race, creed, color, sex, national origin, **sexual orientation** or age.

6

7

SECTION 3. There shall be no discrimination against any individual for upholding Union principles, Union membership or for Union activities.

## ARTICLE 11
## BONDS

Should any individual be required to give bond, cash bond shall not be compulsory and no premium shall be paid by the individual. However, if the regular bonding company refuses to bond any individual and the individual is able to secure a bond elsewhere, said individual shall pay the difference in the premium involved. Cancellation of a bond shall not be cause for discharge, unless the bond is canceled due to the individual giving a fraudulent statement in obtaining said bond, or a breach of the conditions of the bond which would result in the individual not being bondable, or such individual cannot be bonded.

## ARTICLE 12
## MILITARY SERVICE AND VOTING

SECTION 1. Federal and State laws concerning rights of re-contracting for agents going into military service without loss of seniority or benefits shall be followed.

SECTION 2. The rights of covered individuals to vote in all State, County, District or National elections shall be respected.

## ARTICLE 13
## LEAVE OF ABSENCE

Reasonable requests for leaves of absence shall be granted. Requests shall be reasonable for:
1. Maternity
2. Compelling personal reasons
3. Sickness
4. Union leave

8

## ARTICLE 14
## GRIEVANCE PROCEDURE

SECTION 1. Grievances must be filed within 30 days after a violation. If the violation could not have been discovered with the exercise of due diligence within such 30 day period, grievances may be filed within 10 days of discovery, provided, that no grievance shall be valid if filed more than 10 days after the SGA has terminated or changed territory if such grievance pertains to the territory the SGA no longer has. A grievance not filed within the required time period is invalid. Grievances shall be handled by the following procedure.

STEP 1. A grievance shall be submitted in writing, with a copy to the Union, and to the SGA believed to be in violation. If there is no settlement within 10 days, the Union may, if in its best judgment the grievance has merit, proceed to Step 2.

STEP 2. If the Business Agent of the Union, or his representative, is not able to settle the dispute, the Union may certify the grievance to Step 3. Written notice of certification shall be given to the Company, the grievant, and the SGA believed to be in violation.

STEP 3. Grievances certified will be submitted to arbitration. A permanent arbitrator may be selected by agreement. Should the permanent arbitrator be unable to serve and the parties are unable to agree upon a substitute, the parties shall agree on another selected from the Federal Mediation and Conciliation Service using the elimination service provided by that agency.

9

SECTION 2. Unless otherwise agreed, arbitration shall be held at a hotel in the vicinity of the Dallas/Fort Worth airport. An agreement to hold arbitration elsewhere shall specify who shall be responsible for the travel and hotel expense of the arbitrator. The losing party shall pay the arbitrator's fee for services and hearing expense, unless otherwise agreed.

SECTION 3. When in the opinion of the arbitrator the interest of justice would be served, testimony may be received by telephone, and sworn affidavits may be used as well as testimony and documentary evidence. Parties to the arbitration and the Company shall comply with the requests of the arbitrator for the production of documentary evidence and records in their possession.

SECTION 4. Each settlement agreement or arbitration award shall specify the party to be charged or the action required. Each SGA shall be responsible for action required of that SGA, and shall comply. The Company shall be responsible for orders directed against it, and shall comply. No SGA will be responsible for settlements or awards against another SGA or the Company. Arbitration awards shall be final and binding.

SECTION 5. Grievances and disputes eligible for grievance shall be handled exclusively in accordance with this procedure. No person shall initiate any procedure with any court or government agency until remedies under this contract have been exhausted.

SECTION 6. Persons possess grievance rights whose contract is that of an agent or a PR Rep and cover matters that arise over a violation of said contract and this Agreement. Grievance rights do not extend to matters that arise under a SA, GA, MGA or Manager contract. Persons who have disputes that arise under such a contract may by specific agreement in a particular dispute use the grievance procedure and arbitration facilities of the Union.

10

To use voluntary arbitration, persons must notify the Union in writing of the dispute, of the agreement on paying arbitrator's expenses and hearing costs, and of the requested time of arbitration. Any award made pursuant to voluntary arbitration proceedings will be final and binding on both parties. The Union's sole function will be to assist both parties in using the voluntary arbitration and not to represent either party. The Union will also use its facilities to notify all parties of time, date, place of hearing, guide the proceedings, and schedule meetings and arbitration as necessary.

## ARTICLE 15
### INSURANCE

SECTION 1. Upon meeting specified production levels, additional commissions as indicated in the chart below shall be available for each full time person who purchases health insurance or Medicare supplemental insurance as well as dependent coverage. The number of years indicated below represent years of service or contract.

**Less than 5 Years**

| | |
|---|---|
| 7/2009 | $225 Individual |
| | $105 Dependent |
| 7/2010 | $230 Individual |
| | $110 Dependent |
| 7/2011 | $235 Individual |
| | $115 Dependent |

**5 Years But Less Than 10**

| | |
|---|---|
| 7/2009 | $250 Individual |
| | $115 Dependent |
| 7/2010 | $260 Individual |
| | $120 Dependent |
| 7/2011 | $270 Individual |
| | $125 Dependent |

11

**10 Years +**

| | |
|---|---|
| 7/2009 | $290 Individual |
| | $125 Dependent |
| 7/2010 | $300 Individual |
| | $130 Dependent |
| 7/2011 | $310 Individual |
| | $135 Dependent |

SECTION 2. The Union's responsibility is limited to negotiating the level of contribution. The Union shall have no responsibility regarding the benefits, the insurance carriers, and the administration of the commission payments.

SECTION 3. A full time person, who otherwise qualifies may begin to receive such commissions 3 months after the most recent date of contract. Date of contract for an agent is the date business is first coded to that agent's account. The date of contract for a PR Rep is the date the PR contract is executed by the Company.

SECTION 4. To qualify for additional commission as outlined in Section 1, an agent must have **$15,500** of net annualized life premium per quarter through July 2010. July 2010 **the requirement increases to $16,000.** July 2011 **the net annualized life premium requirement increases to $16,500** If an agent maintains that level of production for **nine (9)** months, they will be allowed to miss qualification for one quarter that next year without losing the additional commission used for the purchase of health insurance.

To qualify for additional commissions as outlined in Section 1, a PR Rep must have either **2,000** cards or **10** groups plus **1,000** cards in the most recent quarter. PR Reps who have been with the company for less than one year must have 750 cards per quarter to be eligible. If a **PR Rep** maintains that production level for a period of nine (9) months

12

from qualification, he/she shall be allowed to miss **qualification one quarter** each year without losing **the additional commission for the purchase of health insurance.**

For the purposes of this section, to qualify as a "group" the following criteria must be met. The group is required to have a minimum of 50 members and Home Office records must show the mailing has generated the greater of a 3% response rate or 10 response cards.

A quarter is a calendar quarter. A person who has not been contracted with the company for a full calendar quarter may initially qualify on the basis of the immediately preceding 3 calendar months.

SECTION 5. Payments may be made to a provider directly, or through the covered person. The amount shall not exceed the cost for coverage.

SECTION 6. In the event of TOTAL disability or terminal illness (with proper documentation from a physician), qualified agents and PR Reps will maintain the extra commissions paid for 1 month for each year of service up to 12 months from the date they no longer qualify as outlined in Section 4; they must have previously qualified under the terms of this article for a period of **30** consecutive months.

SECTION 7. Each person who qualifies under this article shall also be furnished group term life insurance as **outlined below** at no cost to the person.

| Years of Service | Group Term Life |
|---|---|
| Less than 5 Years | $15,000 |
| 5-10 Years | $20,000 |
| 10+ Years | $25,000 |

13

## ARTICLE 16
## COMPANY PROGRAMS

SECTION 1. Agents and PR Reps shall be entitled to participation in company bonus and recognition programs, including conventions, upon meeting the published requirements.

SECTION 2. A minimum of **$1,000,000** will be paid to agents or PR Reps in regular bonuses each contract year, rewarding superior production and persistency. The Company will design the qualification levels in consultation with the Union using best efforts to obtain a participation level of at least **25%**.

## ARTICLE 17
## PR REP COMPENSATION

SECTION 1. PR Reps whose primary responsibility is producing leads shall have a written agreement and should be compensated according to the compensation scale in this article. The agreement shall become a part of this Agreement and a copy shall be sent to the Union.

SECTION 2. A career path is established to provide PR Reps with the opportunity to qualify for increased compensation levels based on continuous length of service and minimum production guidelines. Progression is automatic if the career PR meets or exceeds the guidelines established in this section and Section 6. Progression may be earlier if the PR and the SGA involved so agree in writing. The contract levels available will be contracts A, B, C and D. The term "minimum production" in this Article 17 means response cards generated and/or groups obtained through the PR Rep's efforts. The minimums will be evaluated on the PR Rep's anniversary date their first year (their first 12 months of contract), and thereafter on a calendar year basis every January based on year-end results.

For all sections of Article 17, a "group" is defined as one that has a minimum of 50 members and the greater of a 3% card return or 10 response cards reported to Home Office. The term "continuous service" as is used in this Agreement means that the Career PR has been under contract continuously for the length of time required.

For the purposes of Section 2, Section 4, and Section 5 of this Article 17, the PR Rep's initial contract date will be used to determine length of service. Below are the time frames and production requirements for progression to the various contract levels available to PR Reps:

| Years | Contract | Required for Progression |
|---|---|---|
| 1st year | A | 9,000 cards or 36 groups plus 4,500 cards |
| 2nd-3rd years | B | 12,000 cards or 48 groups plus 6,000 cards |
| 4th-5th years | C | 15,000 cards or 60 groups plus 7,500 cards |
| After 5 years | D | |

A PR Rep with at least 1 year of service and the required minimums will progress to contract B. A PR Rep with at least three years of service and the required minimums will progress to contract C. A PR Rep with at least 5 years of service and the required minimums will progress to contract D.

The Company may return a career PR to a lower compensation contract for failing to meet the minimum requirements established under this section and Section 6 of this Article 17. The minimums to maintain each contract level are as follows:

14

15

Contract A
7,500 cards per year or 36 groups plus 3,750 cards

Contract B
9,000 cards per year or 36 groups plus 4,500 cards

Contract C
12,000 cards per year or 48 groups plus 6,000 cards

Contract D
15,000 cards per year or 60 groups plus 7,500 cards

SECTION 3. The compensation scale is based on the number of leads produced. If no response card is involved, the compensation shall be $2.00 for the first 250 letters mailed, $1.50 for the next 250, and $1.00 for all over 500.

SECTION 4. An original working of an organization is when that organization has not been worked (mailed) within the last three (3) years. A renewal or rework of an organization would include any that would not qualify as an original working.

Below is a schedule of compensation for each level of career PR including an increase for successive union contract years. The compensation is based on the response cards received from an original or renewal mailing:

| Contract | Contract Year | Original | Renewal |
|----------|---------------|----------|---------|
| A | 7/2009 | 5.45 | 4.25 |
|   | 7/2010 | 5.70 | 4.40 |
|   | 7/2011 | 5.90 | 4.55 |
| B | 7/2009 | 5.65 | 4.45 |
|   | 7/2010 | 5.90 | 4.60 |
|   | 7/2011 | 6.10 | 4.75 |
| C | 7/2009 | 6.05 | 4.65 |
|   | 7/2010 | 6.30 | 4.80 |
|   | 7/2011 | 6.50 | 4.95 |
| D | 7/2009 | 6.45 | 4.85 |
|   | 7/2010 | 6.70 | 5.00 |
|   | 7/2011 | 6.90 | 5.15 |

16

SECTION 5. When any properly serviced group currently under contract with a particular PR Rep is officially merged into another group that is signed by a different PR Rep, the original PR Rep will receive a one-time split of commissions when the next mailing is done based upon the number of members merged, provided that is at least 1,000 members.

SECTION 6. To encourage each self-employed PR Rep to save for their retirement, the following extra compensation amounts would be deposited to the PR Rep's qualified retirement account established under the United States Internal Revenue Code, hereinafter referred to as the "Account", based on a matching percentage of what the PR Rep contributed to their Account in each calendar year. The matching percent available increases each year through the 10th year for continuous service. The percent noted relates to the total annual (calendar year) compensation for the PR Rep that will be matched, limited to a maximum of 12% of the PR Rep's response card earnings for the calendar year. In order for the matching to be available, the PR Rep would be required to provide proof of the amount they personally contributed to their Account during the prior calendar year. The statements of proof of contribution must be provided to the Company by February 28th of each year. The extra compensation amount would then be deposited into the PR Rep's Account by March 31st of that year, provided they met the minimum standard requirements and they have not exceeded the maximum contribution allowed under their plan. Below is the matching schedule based on the length of service for each PR Rep:

| Years Of Service Completed | Percent of Annual Card Earnings Match (12% Maximum Per Year) |
|----------------------------|-------------------------------------------------------------|
| Year 1 | 2% |
| Year 2 | 3% |

17

| Years Of Service Completed | Percent of Annual Card Earnings Match (10% Maximum Per Year) |
|---|---|
| Year 3 | 4% |
| Year 4 | 5% |
| Year 5 | 6% |
| Year 6 | 7% |
| Year 7 | 8% |
| Year 8 | 9% |
| Year 9 | 10% |
| Year 10+ | 12% |

In order for this matching to be available, the PR Rep at the time of payment must have an active contract with the Company, have been contracted at least one year, and be meeting the minimum production standards.

SECTION 7. Company may, from time to time, establish minimum production standards for career PR Reps so long as they do not exceed the "minimum production for progression" defined in Section 2 and may take appropriate action if those standards are not met. The minimums are outlined in Section 2 of this Article.

SECTION 8. Commissions are earned when a response card is received, or if no response card is involved, when the mailing is made. The commission schedule in effect on the date of the organization's consent to a mailing shall govern. Earned commissions shall be credited within two weeks. If an organization is mailed in segments, commissions shall be credited at least once each month, covering cards received more than one week prior to the date of credit. To qualify for commission, the working of an organization and the manner of such working must be approved in advance by the SGA. A PR Rep who is compensated solely in accordance with the compensation scale

shall maintain rights to any Union local set up by that PR Rep if the local is properly serviced and if authority to mail it again is obtained and the mailing is generated within 120 days after a request to do so by the SGA. There shall be no reduction of commissions for response cards received during the coverage period unless there has been a new mailing.

SECTION 9. Agents, insofar as they spend any portion of their time performing public relations work and producing leads, shall be compensated exclusively as an agent except as agreed between such agent and the SGA. Public relations work performed and leads produced by the SGAs and General Agents shall not be subject to the grievance procedure.

SECTION 10. No commission is earned for a duplicate response card. A duplicate is an additional card from the same household and same group received within six (6) months of the first card.

SECTION 11. Breach of contract by a PR Rep at any time shall result in the termination of any compensation that might become due.

## ARTICLE 18
## AGENT COMPENSATION

SECTION 1. Compensation of agents shall be in conformity with contract. Agents shall have a written agreement. The agreement shall become a part of this Agreement and a copy shall be sent to the Union. There shall be no changes in the commission schedule without prior notification to the Union. An agent shall have the standard company 50% contract not later than 45 days after date of contract, or when the month end report is available showing the agent has submitted $10,000 in annualized life premium, whichever is earlier.

Agents who are contracted after the effective date of this Agreement will be contracted as "career

18

19

agents" under Section 4 of this Article 18. Agents who are under contract on the effective date may elect to become career agents, as set forth in Section 4. An agent who does not make that election is a "non-career agent" and the compensation of non-career agents is governed by Article 18 of the collective bargaining agreement that was in effect immediately prior to the effective date of this Agreement.

SECTION 2. An agent shall not be charged for leads or appointments. An agent may make telephone appointments or pay others to do so for the agent. Payments by an agent shall not constitute a prohibited payment for appointments if such payment is made directly to the person making such appointments on a voluntary basis, even though such effort is organized by the Agency or the Agency contributes to the cost.

SECTION 3. The provision in the agent's contract that provides for termination upon 30 days notice shall not be exercised against any agent if the reason for such termination is the exercise by the agent of any right under this contract.

SECTION 4. A career path is established to provide career agents with the opportunity to qualify for commission levels above the standard 50%, based on continuous length of service, minimum production, and quality of business. Progression is automatic if the career agent meets or exceeds the guidelines established in this Section 4 and Section 5. Progression may be earlier if the career agent and the SGA involved so agree in writing. The term "minimum production" in this Section 4 means that policies issued through the career agent's efforts in the 12-month period immediately preceding the applicable anniversary of the career agent's contract have produced at least $72,000 of net annualized life premiums. (Note: the company's standard 52.5%, 57.5% and 62.5% contracts referred to below provide varying percentage and duration of commissions, based on the type of policy.)

20

The term "continuous service" as is used in this Agreement means that the Career Agent has been under Contract continuously for the length of time required.

(A) A career agent with at least one year of continuous service who has met the minimum production requirement will be entitled to receive first year and renewal commissions under the company's standard 52.5% contract (a "52.5% career agent"), on all business written under the 52.5% contract after that date.

(B) A 52.5% career agent with at least three years of continuous service who has met the minimum production requirement will be entitled to receive first year and renewal commissions under the company's standard 57.5% contract (a "57.5% career agent"), on all business written under the 57.5% contract after that date.

(C) A 57.5% career agent with at least five years of continuous service who has met the minimum production requirements will be entitled to receive first year and renewal commissions under the company's standard 62.5% contract, on all business written under the 62.5% contract after that date.

(D) A career agent with at least five years of continuous service with a minimum production requirement of $500,000 of net AP (net annualized premium) within that same 5 year period will be entitled to receive first year and renewal commissions under the company's standard 65% contract, on all business written under the 65% contract after that date.

21

(E) A career agent with at least 10 years of continuous service and a minimum production requirement of $500,000 of net AP (net Annualized Premium) within the last five (5) years of which $100,000 must have been in the last twelve (12) months will be entitled to receive first year and renewal commissions under the company's standard 67.5% contract on all business written under the 67.5% contract after that date. The career agent must also maintain a production minimum of $100,000 of net AP per year thereafter.

(F) The company may return a career agent to a lower commission contract for failing to meet the minimum requirements established under Section 6 of this Article 18.

(G) An Agent age 57 and over who is fully vested with 10 years of service will have no ALP production minimum standard to maintain contract. If age changes in future negotiations, anyone already qualified will not be impacted or lose qualification.

SECTION 5. (A) Subject to the conditions contained in (B) through (F) of this Section 5, the following vesting percentages apply to renewal commissions payable under the commission schedule applicable to the career agent's contract:

   (i) Career agents with less than one year of service are not eligible for vesting.

   (ii) If the career agent has completed one year of continuous service, but less than two, 10% of the commissions earned following the career agent's termination date shall be vested.

   (iii) If the career agent has completed two years of continuous service, but less than three, 20% of the commissions earned following the career agent's termination date shall be vested.

   (iv) If the career agent has completed three years of continuous service, but less than four, 30% of the commissions earned following the career agent's termination date shall be vested.

   (v) If the career agent has completed four years of continuous service, but less than five, 40% of the commissions earned following the career agent's termination date shall be vested.

   (vi) If the career agent has completed five years of continuous service, but less than six, 50% of the commissions earned following the career agent's termination date shall be vested.

   (vii) If the career agent has completed six years of continuous service, but less than seven, 60% of the commissions earned following the career agent's termination date shall be vested.

   (viii) If the career agent has completed seven years of continuous service, but less than eight, 70% of the commissions earned following the career agent's termination date shall be vested.

   (ix) If the career agent has completed eight years of continuous service, but less than nine, 80% of the commissions earned following the career agent's termination date shall be vested.

   (x) If the career agent has completed nine years of continuous service, but less than 10, 90% of the commissions earned following the career agent's termination date shall be vested.

(B) In order to be eligible for vesting of commissions, a career agent with less than four years of continuous service must have a 4-month retention rate equal to or greater than company average on the most recent available report at the time of termination. The "4-month retention rate" is the retention rate calculated by the company in the ordinary course of business.

(C) The termination date for the career agent is the date the career agent ceases work or is given notice of termination, whichever is earlier. **Career agent will return all business records of AIL and/or the SGA through which they were contracted (including leads, referrals, policyholder records, materials, etc.) without retaining copies.**

(D) The vesting schedule in (A) applies only to renewal commissions on policies issued after the execution date of the career agent contract. **For agents contracted prior to April 1, 2002 when the Career Agent contract became available, vesting of non-career agent accounts (prior accounts) are governed by the agent's old contract and vesting.** However, that agent's initial contract date will be used to determine the percentage of vesting applicable to those policies issued after the execution date of the career agent's contract. A career agent who has completed less than 10 years of continuous service is not eligible for vesting of renewal commissions for the life of the policy.

(E) If a career agent has completed 10 years of continuous service, 100% of that career agent's renewal commissions earned on life business are vested for the life of the policies,

and that vesting continues after termination of the career agent's contract, subject to the following:

(i) The lifetime renewal commissions are only on life business produced under the career agent's contract, based on the renewal rate in effect in the 10th year of that career agent's contract. For current agents who elect to become career agents, the lifetime renewal commissions are not payable on business produced under their old contract.

(ii) Renewal commissions are based on the commission schedule of the career agent's contract and the policy type sold. For example, the renewal commission payable at the beginning of the 11th policy year is the same as that payable during the 10th policy year.

(F) If a career agent who has completed 3 years of continuous service dies while he is under contract and active with the Company, the career agent's renewal commissions are deemed fully vested and will be payable to the career agent's estate on life business for the life of the policies.

SECTION 6. Company may, from time to time, establish minimum production standards for career agents so long as they do not exceed the "minimum production" defined in Section 4, and may take appropriate action if those standards are not met. The minimum production standard for the 65% career agent level is $100,000 of Net AP per year.

SECTION 7. Vested commissions will be credited as earned. Commissions that are payable in cash shall be paid monthly if the amount exceeds $25. In any calendar year following termination, the company

24

25

may elect to terminate paying the vested renewals if they are less than $150 per quarter. Each agent will be furnished a copy of that agent's contract upon request.

SECTION 8. Any terminated agent may have renewal checks and ledger statements (not detail policy list) mailed directly to the agent after indebtedness has been paid.

## ARTICLE 19
## DURATION

SECTION 1. This Agreement shall become effective July 1, **2009** and shall continue until July 1, **2012** and shall automatically renew thereafter from year to year unless either party notifies the other in writing at least 60 days prior to the expiration date of a desire to terminate or change the provisions of this Agreement.

SECTION 2. If, at any time after such expiration date, or end of the subsequent agreement year, negotiations should break down, any party may terminate this Agreement upon notice to the other.

26

**AMERICAN INCOME LIFE
INSURANCE COMPANY**

*Signed on behalf of the Company.*

By _____
Roger Smith, President, Chief Executive Officer

By _____
Debbie Gamble, Senior Vice President-Agency

*Signed on behalf of the State General Agents.*

By _____
Joe Manone, State General Agent


**OFFICE AND PROFESSIONAL EMPLOYEES
INTERNATIONAL UNION LOCAL 277**

*Signed on behalf of the Union.*

By _____
Becky Turner, President & Business Manager

By _____
Margo Peel, Secretary-Treasurer &
Asst. Business Representative

27